IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

WARREN HESTER, II,         )
         )
    Petitioner,       )
         )
v.         )     CIVIL ACTION NO. 5:13–021007
         )
DAVID BALLARD, Warden,    )
         )
    Respondent.     )

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Respondent's Motion for Summary Judgment (Document No. 36.), filed on October 10, 2014, by Shannon Frederick Kiser, Assistant Attorney General. Petitioner filed his Response on November 6, 2014. (Document No. 46.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Respondent's Motion for Summary Judgment.

## PROCEDURAL HISTORY

On May 9, 2005, the Grand Jury of Raleigh County, West Virginia, returned an Indictment against Petitioner, charging him with two counts of First Degree Sexual Assault in violation of West Virginia Code § 61-8B-3 (Counts 1 and 2); one count of Battery in violation of West Virginia Code § 61-2-9(c) (Count 3); one count of Brandishing a Deadly Weapon in violation of West Virginia Code § 61-7-11 (Count 4); one count of Kidnaping in violation of West Virginia Code § 61-2-14 (Count 5); and one count of Nighttime Burglary in violation of West Virginia Code § 61-3-11 (Count 6). State v. Hester, Criminal Action No. 05-F-189 (Cir. Ct. Raleigh Co. Feb. 24, 2006); (Document No. 35-1.) Following a five-day jury trial, Petitioner was convicted of all counts on January 11, 2006. (Document No. 35-2.) By Order entered on February 24, 2006, Petitioner was

sentenced to following: a term of not less than fifteen (15) years nor more than thirty-five (35) years on the charge of First Degree Sexual Assault on each of Counts 1 and 2; a term of six (6) months on the charge of Battery (Count 3); a term of one (1) year on the charge of Brandishing (Count 4); a life sentence without the possibility of parole on the charge of Kidnaping (Count 5); and a term of not less than one (1) year nor more than fifteen (15) on the charge of Nighttime Burglary (Count 6). (Id.) The Circuit Court ordered that "Counts 1, 2, 3, 4, and 6 shall run consecutively with one another and shall run consecutively to Count 5."[1] (Id.)

On August 29, 2007, Petitioner, by counsel, Warren R. McGraw II, filed his Petition for Appeal with the West Virginia Supreme Court of Appeals, raising the following assignments of error:

1.  The [Circuit] Court should have granted the defendant's Motion to Refuse the testimony from Lisa Hartman.

2.  [The Circuit Court erred in admitting] improper 404(b) evidence.

3.  The [Circuit] Court erred in refusing to allow the defendant to present evidence that seminal DNA belonging to another person was found on the pillowcase of the victim's bedding.

4.  The [Circuit] Court erred in allowing the State to call witnesses at trial which were disclosed to the defendant less than a week before trial.

5.  The [Circuit] Court erred in permitting admission of a photo of the alleged victim standing in her pajamas.

6.  The [Circuit] Court erred in permitting the State to question the victim on her belief in God.

---

[1]  In the Sentencing Order, the Circuit Court noted that Petitioner "refused to enter the courtroom, refused to appear and refused to exercise his right of allocution." The Circuit Court determined that "defendant knowingly, intelligently and voluntarily waives his right to be present and his right to allocution." (Document No. 35-2.)

7.  The [Circuit] Court erred by allowed the State to call a witness and present evidence concerning prior juvenile offenses in Ohio and Washington, D.C.

8.  The [Circuit] Court erred in refusing to dismiss the charge of kidnaping when the indictment returned in this matter failed to set forth the statute the State planned to apply and the acts of kidnaping alleged to be performed by the defendant were incidental to the charge of sexual assault.

9.  The [Circuit] Court erred in refusing to instruct the jury on lesser included offenses.

10. The [Circuit] Court erred in refusing such other instructions as presented by the defendant or presenting State instructions objected to by the defendant.

11. The State's assertions during closing argument at the guilt stage of this case were burden shifting.

12. The [Circuit] Court erred in allowing the State to present testimony from Dr. David Clayman in the mercy portion of the trial.

13. The [Circuit] Court erred in declaring a deadlock by the jury on the issue of mercy.

14. The [Circuit] Court erred in refusing to remove cameras from the courtroom during sentencing.

15. The [Circuit] Court erred in allowing a family member of Detective Cedric Robinson to sit as a juror in this matter.

16. The [Circuit] Court erred in denying the defendant's post trial motions requesting a new trial and judgment of acquittal notwithstanding the jury verdict.

(Document No. 35-3.) The West Virginia Supreme Court refused Petitioner's Petition for Appeal by Order entered on May 22, 2008. (Document No. 35-4.) Petitioner filed a petition for certiorari in the United States Supreme Court, which was denied on November 17, 2008. Hester v. West Virginia, 555 U.S. 1032, 129 S.Ct. 596, 172 L.Ed.2d 458 (2008).

On August 11, 2008, Petitioner, acting *pro se*, filed a Petition for Writ of *Habeas Corpus* in the Circuit Court of Raleigh County. Hester v. Ballard, Civil Action No. 08-C-716 (Cir. Ct. Raleigh

Co. March 2, 2012); (Document No. 35-5.) Petitioner raised the following grounds for *habeas* relief:

1. The [Circuit] Court abused its discretion in admitting improper evidence or Petitioner's character into the State's case in chief through direct testimony of Lisa Hartman over Petitioner's objections.

2. The [Circuit] Court abused its discretion by allowing the State to introduce Petitioner's juvenile records in the State's case in chief under the guise of 404(b) evidence in direct violation of both Rules 609(d) of the [West Virginia Rules of Evidence] and [West Virginia Code §] 49-7-3.

3. The [Circuit] Court abused its discretion in failing to allow Petitioner to introduce evidence that someone else's seminal DNA was found on the victim's bedspread.

4. The [Circuit] Court abused its discretion in allowing the State to call witnesses who were not noticed to Petitioner in a timely manner before trial.

5. The [Circuit] Court abused its discretion in allowing the State to introduce a picture of the victim standing in her pajamas over the objection of the Petitioner.

6. Petitioner's right to due process and equal protection was violated where the State placed religion as an issue for the jury's consideration.

7. The [Circuit] Court abused its discretion in allowing out-of-state witnesses to testify about Petitioner's juvenile history.

8. Petitioner's Fifth Amendment right not to be subjected to double jeopardy was violated when he was charged with the offense of Kidnaping, which was incidental to the offense of First Degree Sexual Assault.

9. The [Circuit] Court abused its discretion in declaring a deadlocked jury, and deciding to impose a sentence of life without mercy.

10. The [Circuit] Court abused its discretion in allowing a family member of, the Chief of Police, Cedric Robinson to sit as a juror over Petitioner's objections.

11. The [Circuit] Court abused its discretion in denying Petitioner's post trial motions requesting a new trial and judgment of acquittal notwithstanding the jury verdict.

(Id.) The Circuit Court appointed Matthew A. Victor as *habeas* counsel. (Document No. 3-2, pp. 4 -

5.) Petitioner, however, filed a "Motion to Eradicate Appointment of Counsel" stating that he rejected the appointment of counsel and insisted on proceeding *pro se*. (Id., p. 5.) The Circuit Court granted Petitioner's request to proceed *pro se*, but the Court reappointed Mr. Victor as standby counsel to act only in an advisory capacity and on an "as need" basis. (Id.)

On April 14, 2009, Petitioner, acting *pro se*, filed an Amended *habeas* Petition. (Document No. 35-6.) Petitioner raised the following grounds for *habeas* relief:

1.    The [Circuit] Court violated the Petitioner's constitutional rights by allowing the State to use his juvenile records as the State's case-in-chief evidence.

2.    The [Circuit] Court violated the Petitioner's constitutional rights by unconstitutionally denying the Petitioner to introduce the fact DNA forensic evidence of someone else's seminal fluid was found on the alleged victim's (who was an eleven (11) year old child) bedspread.

3.    Petitioner's Fifth Amendment, along with other constitutional rights not to be subject to double jeopardy was violated by the State when he was charged and convicted with the offense of kidnaping, which is incidental to the charge of first degree sexual assault.

4.    Petitioner's Sixth Amendment right along with his right to effective assistance of counsel are being violated by the [Circuit] Court and court appointed counsel.

5.    The State violated the Petitioner's constitutional rights by religious questioning, lying to the Petitioner's trial jury, along with violating well specified laws (that carries jail time and is considered criminal activity) of a Federal City and two (2) States.

6.    The [Circuit] Court violated the Petitioner's constitutional rights by inappropriately, improperly, and erroneously instructing the Petitioner's trial jury on the essential elements of the West Virginia Kidnaping Statute § 61-2-14(a).

7.    Petitioner's constitutional rights are violated due to the cumulative constitutional violations, effect of multiple unconstitutional acts, denying Petitioner a constitutional fair trial.

(Id.) The Circuit Court conducted omnibus hearings on June 30, 2010 and November 9, 2011.

5

(Document Nos. 35-19 and 35-20.) The Circuit Court heard testimony from Hassan S. Rasheed and Joeseph A. Hoggy, Petitioner's trial counsel. (Id.) Petitioner appeared in person at both hearings and was accompanied by Mr. Victor, advisory counsel. (Document No. 3-2, p. 6.) During the June 30, 2010, hearing, the Circuit Court "announced that it wished to follow the outline of potential grounds for *habeas corpus* relief set forth in the case of Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606 (1981), commonly referred to as the 'Losh List.'" (Id.) Petitioner, however, refused to complete and sign a Losh List. (Id., pp. 6 - 7.) Accordingly, the Circuit Court addressed all possible Losh grounds and the specific grounds asserted by Petitioner in his Petition. (Id., p. 7.) After addressing the merits of the above claims, the Circuit Court denied Petitioner's Petition for Writ of *Habeas Corpus* in a ninety-nine page Judgment Order entered March 2, 2012. (Document Nos. 3-2 and 3-3.)

On March 13, 2012, Petitioner filed his Notice of Appeal concerning the Circuit Court's decision denying his *habeas* Petition. (Document No. 35-7.) On June 4, 2012, Petitioner filed his brief raising the following grounds:

1.  Did the habeas court commit error when denying Petitioner relief concerning the criminal trial court allowing, and the State prosecutor using, his juvenile record as case-in-chief evidence?

2.  Are sections of West Virginia Code § 49 unconstitutional or did the habeas court commit error when ruling (the first State court to do so) sections of West Virginia Code § 49 do not equally protect Petitioner's juvenile record (while Petitioner is within this state and a citizen of this State)?

3.  Did the habeas court commit error when denying Petitioner relief concerning the criminal trial court denying Petitioner to present exculpatory DNA seminal fluid case evidence to the jury?

4.  Did the habeas court commit error when denying Petitioner relief concerning Petitioner's trial counsel and/or their law office being ineffective in failing to conduct an effective alibi defense; representing conflicts of interest; failing to argue the full faith and credit of case laws of juvenile record prohibitions; failing to object to the prosecutor's falsification of DNA case evidence; failing to object to religious

6

questioning to State's star witness; and failing to object to State's personal opinion during closing arguments concerning Petitioner's testimony and guilt?

5.     Did the habeas court commit error when denying Petitioner relief concerning the State prosecutor falsifying exculpatory seminal DNA case evidence to the jury; the State prosecutor asking the State's star witness religious opinionated questions in front of the jury; the State prosecutor using Petitioner's juvenile family record excessively and as chief evidence to the jury; and the State prosecutor providing their personal opinion of the Petitioner's trial testimony and guilt?

6.     Did the habeas court commit error by granting the Respondent's motion to deny Petitioner to argue ineffective assistance of appellate counsel in his habeas petition?

7.     Did the habeas court commit error when denying Petitioner relief concerning Petitioner's appellate counsel's failure to conduct an effective direct appeal?

(Document No. 35-8.). By Memorandum Decision filed on April 19, 2013, the West Virginia Supreme Court of Appeals affirmed the decision of the Circuit Court. (Document No. 3-1.); Hester v. Ballard, Case No. 12-0324 (W.Va. April 19, 2013).

On July 26, 2013, Petitioner, an inmate at Mount Olive Correctional Complex ["MOCC"], and acting *pro se*, filed his "Motion to Hold in Abeyance Petitioner's Petition," Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody, and Memorandum in Support.[2] (Document Nos. 1 - 3.) Petitioner alleges the following grounds for *habeas* relief:

1.     The criminal trial court allowed, and the State prosecutor used, Petitioner's District of Columbia and State of Ohio family court civil juvenile record excessively and as case-in-chief evidence, in derogation of (and Petitioner's rights to) the United States Constitution and Federal Statutes.

2.     West Virginia Code §§ 49-7-3, 49-7-1, and 49-5-17(d) are unconstitutional and denied Petitioner the equal protection of the law in violation of the United States Constitution's 14th Amendment and Petitioner's rights thereof.

---

[2] Because Petitioner acted *pro se* initially in this matter, the documents which he has filed in this case will be held to a less stringent standard than if they were prepared by a lawyer and therefore, they will be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

3.      The criminal trial court denied Petitioner to present exculpatory DNA seminal fluid case evidence to the jury in violation of (and Petitioner's rights to) the United States Constitution.

4.      Petitioner's trial counsel and/or his law office was ineffective in (a) failing to conduct a proper and effective alibi defense, (b) forced to represent conflicts of interest, (c) failing to argue the full faith and credit of juvenile record prohibitions, (d) failing to object to prosecutor's falsification of DNA case evidence and (e) failing to object to religious questioning of State's star witness in violation of (and Petitioner's rights to) the United States Constitution.

5.      The State prosecutor (a) falsified exculpatory case evidence to the jury, (b) asked the State's star witness religious questions in front of the jury, (c) and used Petitioner's juvenile record as chief evidence in derogation of (and Petitioner's rights to) the United States Constitution.

6.      The Circuit Court granting of the Respondent's motion to deny Petitioner to argue ineffective appellate counsel as a ground in his habeas petition was unconstitutional in violation of (and Petitioner's rights to) the United States Constitution.

7.      Petitioner's direct appeal counsel acted ineffective by failing to conduct Petitioner's direct appeal petition effectively in violation of (and Petitioner's right to) the United States Constitution.

(Document No. 2, pp. 7 - 21.)

As Exhibits, Petitioner attached the following: (1) A copy of the West Virginia Supreme

Court of Appeals' "Memorandum Decision" dated April 19, 2013, affirming the Circuit Court's

denial of Petitioner's *habeas* petition (Document No. 3-1.); (2) A copy of the Circuit Court's

"Omnibus Habeas Corpus Final Judgment Order" entered on March 2, 2012 (Document Nos. 3-2

and 3-3.); (3) A copy of pertinent pages from Petitioner's Pretrial Hearing conducted on December

21, 2005 (Document No. 3-4, pp. 5 - 18, Document No. 3-9, pp. 5 - 13.); (4) A copy of pertinent

pages from Petitioner's trial (Document No. 3-4, pp. 19 - 25, Document No. 3-5, pp. 1 - 2,

Document No. 3-6, pp. 13 - 25, and Document No. 3-7, pp. 1 - 11, Document No. 3-8, pp. 4, 11 -

8

13, Document No. 3-9, pp. 4, 14, 35, 49 - 50; Document No. 3-10, pp. 1 - 6; Document No. 3-11, pp. 30, 35 - 37.); (5) A copy of the Petitioner's juvenile records and pertinent documents related to his juvenile record (Document No. 3-5, pp. 3 - 25,  Document No. 3-6, pp. 1 - 13, and Document No. 3-7, pp. 14, 21 - 25.); (6) A copy of pertinent pages from Petitioner's omnibus hearing (Document No. 3-7, pp. 12 - 13, 15 - 19, Document No. 3-9, pp. 36 - 45; Document No. 3-10, pp. 7 - 49; Document No. 3-11, pp. 26 - 27; Document No. 3-11, pp. 35 - 57.); (7) A copy of pertinent pages from Petitioner's Pretrial Hearing conducted on January 3, 2006 (Document No. 3-8, pp. 7 - 10, Document No. 3-9, pp. 16 - 30.); (8) A copy of pertinent pages from Petitioner's Pretrial Hearing conducted on September 27, 2006 (Document No. 3-8, pp. 14 - 16.); (9) A copy of the West Virginia State Police Forensic Laboratory Report dated January 3, 2006 (Document No. 3-8, pp. 5 - 6.); (10) A copy of M.K.'s written report to the Beckley Police Department (Document No. 3-8, pp. 17 - 19.); (11) A copy of pertinent pages from State's Response to Petitioner's State *habeas* Petition (Document No. 3-8, p. 21; Document No. 3-11, pp. 31 - 34.); (12) A copy of a medical report concerning M.K. from the Greenbrier Physicians, Inc. (Document No. 3-8, p. 20.); (13) A copy of pertinent pages from Petitioner's Pretrial Hearing conducted on January 4, 2006 (Document No. 3-9, pp. 46 - 48.); (14) A copy of Petitioner's "Petition for Appeal" concerning his criminal conviction as filed with the West Virginia Supreme Court (Document No. 3-11, pp. 4 - 25.); (15) A copy of pertinent pages from Petitioner's Post-Trial Hearing conducted on January 16, 2006 (Document No. 3-11, pp. 28 - 29.); and (16) A copy of Petitioner's "Proposed Findings of Facts and Conclusion of Law" as submitted to the Circuit Court (Document Nos. 3-12, 3-13, 3-14, 3-15.).

On January 30, 2014, the undersigned denied as moot Petitioner's "Motion to Hold in Abeyance Petitioner's Petition." (Document No. 14.) Petitioner paid the $5.00 filing fee on February

7, 2014. (Document No. 16.) By Order entered on August 29, 2014, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 28.)

On October 10, 2014, in response to the Court's Order, Respondent filed his Answer, Motion for Summary Judgment and Memorandum in Support thereof with Exhibits. (Document Nos. 34 - 37.) As Exhibits, Respondent attaches the following: (1) A copy of Petitioner's Indictment as filed in State v. Hester, Case No. 05-F-189 (Cir. Ct. Raleigh Co.) (Document No. 35-1.); (2) A copy of the Sentencing Order dated May 10, 2006 (Document No. 35-2.); (3) A copy of the Petitioner's Petition for Appeal as filed with the West Virginia Supreme Court of Appeal on August 29, 2007 (Document No. 35-3.); (4) A copy of the West Virginia Supreme Court of Appeal's Order refusing Petitioner's Petition for Appeal (Document No. 35-4.); (5) A copy of Petitioner's Petition for Writ of *Habeas Corpus* as filed on August 11, 2008, with the Raleigh County Circuit Court (Document No. 35-5.); (6) A copy of Petitioner's Amended Petition for Writ of *Habeas Corpus* as filed on April 14, 2009, with the Raleigh County Circuit Court (Document No. 35-6.); (7) A copy of Petitioner's Notice of Appeal of the Denial of *Habeas* Relief as filed on March 13, 2012, with the West Virginia Supreme Court (Document No. 35-7.); (8) A copy of Petitioner's Appellate Brief as filed on June 4, 2012, with the West Virginia Supreme Court (Document No. 35-8.); (9) A copy of the transcripts from Petitioner's Bond Hearing conducted on September 27, 2005, in Case No. 05-F-189 (Document No. 35-9.); (10) A copy of the transcripts from the Pretrial Motions hearing conduct on December 21, 2005, in Case No. 05-F-189 (Document No. 35-10.); (11) A copy of the transcripts from the Pretrial Motions hearing conduct on January 3, 2006, in Case No. 05-F-189 (Document No. 35-11.); (12) A copy of the Trial Transcripts from January 4, 2006 (Document No. 35-12.); (13) A copy of

the Trial Transcripts from January 5, 2006 (Document No. 35-13.); (14) A copy of the Trial Transcripts from January 6, 2006 (Document No. 35-14.); (15) A copy of the Trial Transcripts from January 9, 2006 (Document No. 35-15.); (16) A copy of the Trial Transcripts from January 10, 2006 (Document No. 35-16.); (17) A copy of the Trial Transcripts from January 11, 2006 (Document No. 35-17.); (18) A copy of transcripts from the Post-Trial Motions hearing conducted on February 16, 2006, in Case No. 05-F-189 (Document No. 35-18.); (19) A copy of the transcripts from the omnibus hearing conduct on June 30, 2010, in Case No. 08-C-716 (Document No. 35-19.); and (20) A copy of the transcripts from the omnibus hearing conduct on November 9, 2010, in Case No. 08-C-716 (Document No. 35-20.).

On October 14, 2014, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a response to Respondent's Motion for Summary Judgment. (Document No. 40.) On October 23, 2014, Petitioner filed his "Traverse to Respondent's Answer." (Document No. 42.) On November 6, 2014, Petitioner filed his Response in Opposition. (Document No. 46.)

## FACTUAL BACKGROUND

Petitioner was charged with first degree sexual assault, battery, brandishing a deadly weapon, kidnaping, and nighttime burglary. The 11-year-old victim, M.K., alleged that on the night of January 20, 2005, Petitioner came to her housing looking for her "Uncle Rick." M.K. stated that her mother was at home during this time and Petitioner left after her mother told him that "Uncle Rick" was not at the house. M.K. alleges that later that night, after her mother left for work, Petitioner returned to the house looking for M.K.'s mother. M.K. stated that she informed Petitioner that her mother was at work and Petitioner again left the house. M.K. alleged that a few minutes later,

11

Petitioner returned to the house and stated that M.K. mother's instructed him to wait for her at the house. M.K. stated that she was home alone with her two younger brothers,[3] who were asleep on the couch in the living room area. M.K. stated that she was also in the living room area watching a movie. M.K. alleged that she fell asleep watching the movie and was awakened by Petitioner removing her sock. M.K. stated that she became afraid and tried to leave the house to contact her neighbors, but Petitioner told her that the neighbors were in bed. M.K. alleged that Petitioner then persuaded her to go into the kitchen to help him turn on the light switch. Once in the kitchen, Petitioner asked M.K. if he could suck her toes. When M.K. told Petitioner "no," M.K. alleges that Petitioner grabbed her from behind and put a kitchen knife to her face. M.K. stated that Petitioner then led her upstairs, pressing the knife against her face that left two cuts to her mouth. Once upstairs, M.K. alleged that Petitioner demanded that she remove all her clothes. M.K. stated that Petitioner then forced her to performed oral sex upon him and then Petitioner performed oral sex upon her. Afterwards, M.K. stated that Petitioner allowed her to get dressed and return downstairs. Once M.K. was downstairs, Petitioner forced M.K. to sit on his lap while he sucked her toes. When Petitioner was finished sucking her toes, M.K. alleged that Petitioner allowed her to sit on the couch while he sat in a chair watching her. Petitioner allegedly did not leave the house until about 10 minute before M.K.'s mother returned from work.

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section

---

[3] M.K.'s younger brothers were ages 2 and 5.

2254(d) provides that when the issues raised in a Section 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the fact.'" 28 U.S.C. § 2254(d)(2). In reviewing a State Court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by the State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003); also see 28 U.S.C. § 2254(e).[4] On this framework, consideration should be given to

---

[4] Title 28, U.S.C. Section 2254(e) provides:

Respondent's Motion for Summary Judgment.

**Motion for Summary Judgment:**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an

---

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

    (A) the claim relies on –
        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

## ANALYSIS

### 1.    Admission of Rule 404(b) Evidence:

Petitioner contends that the Circuit Court erred by allowing the State to introduced "District of Columbia and State of Ohio family court civil juvenile records excessively and as case-in-chief evidence in derogation of Petitioner's" constitutional rights. (Document No. 2, p. 7 and Document No. 3, pp. 5 - 13.) Petitioner argues that defense counsel "never opened the door to let in Petitioner's juvenile record as the State's character, rebuttal, or impeachment evidence." (Document No. 3, p. 6.) Petitioner states that "[i]t has already been unyieldingly established by Constitutional Due Process of the Law that the use of Petitioner's family court civil juvenile record as State's chief evidence in an adult criminal trial is strictly prohibited." (Id., p. 5.) Plaintiff alleges that the admission of his juvenile record "prejudiced the Petitioner by influencing his trial jury that he had to be a bad man and committed the crimes he was charged with, and being tried for as an adult, [because] he was a bad child." (Id., p. 6.) Petitioner contends that he would not have been convicted of the underlying charges had the State been prohibited from admitting his prior juvenile record. (Id., p. 7.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's claim should be

dismissed because "Petitioner's prior bad acts were admitted properly as 404(b) evidence, was not admitted in violation of Petitioner's constitutional rights, and was in the very least harmless error." (Document Nos. 36 and 37.) First, Respondent argues that the Circuit Court correctly admitted Petitioner's prior bad acts because "the nature of the 404(b) evidence in this case outweighed Petitioner's interest in the privacy of his juvenile records." (Document No. 37, p. 17.) Respondent contends that the Rule 404(b) evidence was properly admitted to establish identity, plan, or intent. (Id., pp. 17 - 18.) Respondent explains that "[n]ot only did evidence of Petitioner's prior bad acts show Petitioner's extreme and uncommon fetish of forcefully compelling his victims to allow him to engage in 'toe sucking,' but his prior acts showed that he has a history of cleaning the crime scene to prevent collection of physical evidence." (Id., p. 17.) Respondent further notes that the State satisfied the notice requirement concerning its intent to use evidence of Petitioner's prior bad acts in a letter dated November 14, 2005, and the Circuit Court properly instructed the jury "that Petitioner's prior bad acts could not be used as indicia of guilt beyond establishing identity, plan, or intent." (Id., pp. 17 - 18.) Finally, Respondent argues that [e]ven if this Court disagrees with Respondent's position regarding admissibility of the evidence, such error by the Circuit Court amounted to an unchallengeable evidentiary error and was harmless as the powerful testimony of M.K. was more than sufficient on which to base Petitioner's conviction." (Id., pp. 18 - 19.)

In Response, Petitioner continues to argue that the Circuit Court improperly admitted his juvenile records. (Document No. 46, pp. 5 - 10.) First, Petitioner contends that "[s]ince 1993, Petitioner has never been accused, suspected, nor blamed for any actions or acts related to his juvenile delinquency until these false allegations from M.K." (Id., p. 5.) Petitioner further complains that the "State court failed to acknowledge that Petitioner's juvenile record was thirteen (13) years

old during the time of his adult criminal proceedings." (<u>Id.</u>) Petitioner argues that M.K.'s testimony was insufficient to support his conviction because "[t]here could be several reasons why M.K. lied and reported that Petitioner was the offender." (<u>Id.</u>) Petitioner contends that M.K. was aware of his "toe-sucking" fetish because M.K. "walked in on Petitioner while Petitioner was sucking her mother's toes." (<u>Id.</u>) Petitioner argues that "Respondent cannot dispute Petitioner's grounds of relief, case-in-point, the Respondent cannot support his factual position with admissible evidence and has failed to cite any rebuttal Supreme Court of the United States case law that assert it is constitutionally correct to use Petitioner's juvenile record as the State's chief evidence." (<u>Id.</u>, p. 8.)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

The trial court ruled that the two prior juvenile offenses in which he burglarized women's homes to sexually assault them, were admissible under Rule 404(b) of the West Virginia Rules of Criminal Procedure. Particularly compelling in the court's ruling was Mr. Hester's 'signature brand' of sexual assault, which involved the unusual aspect of sucking the toes of the victims. Furthermore, in all instances, Mr. Hester attacked his victims from behind using the element of surprise to subdue them.

The trial court made the following analysis as to its 404(b) ruling relative to the juvenile records, i.e., that the confidentiality aspect is outweighed by the necessity of this information in these felony proceedings:

THE COURT:        That is an implicit ruling, and I will make it official that, based upon - - regardless of how the information came into the hands of the State, the private and/or normally secret nature of juvenile proceedings and the right of the defendant to have those proceedings maintained secret, the need and the - - the need for the information, the information being directly related to this, the disclosure of that information and/or the need to disclose that information outweighs, in this Court's mind, any right of privacy and/or secrecy with regard to juvenile proceedings, and I have made that finding implicitly.

* * *

Petitioner also claims unfair prejudice in regard to the 404(b) evidence presented at trial. In State v. McGinnis, 193 W.Va. 147, 455 S.E.2d 516 (1994), our Supreme Court of Appeals recognized the prejudice inherent in admitting evidence of other crimes, suggesting that a defendant must be tried for what he or she did, not for who he or she is. Nonetheless, the Court also has acknowledged that there are time that 'other crimes' evidence is admissible if a trial court can take adequate measures to ensure that the evidence will not be misused. In State v. LaRock, 196 W.Va. 294, 470 S.E.2d 613 (1996), the Court reasoned that a defendant is presumed to be protected from under prejudice if the following requirements are met: (1) the prosecution offered the evidence for a proper purpose; (2) the evidence was relevant; (3) the trial court made an on-the-record Rule 403 determination that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave a limiting instruction. LaRock, 196 W.Va. 311, 470 S.E.2d at 630.

In the case *sub judice*, the prosecution offered the evidence to show identity and intent; the court found the evidence to be relevant; Judge Hutchison made an on-the-record determination that the probative value of the evidence was not substantially outweighed by prejudice; and, the court gave specific McGinnis instructions prior to the pertinent testimony and during the court charge. See the Transcript of Pre-Trial Motions Hearing, 12/21/05. (Also, Tr., Vol. III, 1/6/06, pp. 420-421 and Tr., Vol. VI, 1/11/06, pp. 1095-1096.) The trial court took additional measures to guarantee that the "other crimes" evidence would not be misused, in that the two other victims in the prior crimes testified live *in camera* and subsequently, before the jury. Thus, an adequate opportunity was afforded to defense counsel to cross-examine and test the veracity of those prior victims.

This court concludes then that the evidence of prior bad acts was admitted for a proper purpose under Rule 404(b), and satisfied the balancing test of Rule 403. The balancing of probative value against unfair prejudice was, and is, weighed in favor of admissibility. Proper limiting instructions were given by the trial court multiple times to ensure that the jury understood the limited purpose of the testimony concerning the prior acts. There is no proper ground to afford relief to the petitioner here.

(Document No. 3-3, 12 - 17.) Furthermore, the Circuit Court determined that even if the trial court improperly admitted the Rule 404(b) evidence, the error did not have a substantial influence over the jury. (Id., pp. 48 - 50.) The Circuit Court determined that "[t]he victim's testimony alone provides sufficient evidence to prove the elements of all the crimes charged in the indictment, and there is no reasonable possibility that the matters complained about by the petitioner contributed to

18

his convictions." (Id., p. 50.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to the assignment of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 3-1.)

Rule 404(b) of the West Virginia Rules of Evidence prohibits the introduction of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that he or she acted in conformity therewith. A party, however, may use such evidence for other purposes, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. Barbe v. McBride, 521 F.3d 443, 452 (4th Cir. 2008)(Evidentiary rulings by state courts do not constitute a due process violation unless they "were so extreme as to result in a denial of a constitutionally fair proceeding."). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The fact that the admitted evidence allegedly was improper under State law, however, does not provide a basis for *habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the admission of the evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482.

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The State

*habeas* court determined that the trial court properly admitted the Rule 404(b) evidence for purposes

of showing identity, plan, or intent. The State *habeas* court explained that Petitioner's prior bad acts

were admitted for the purpose of showing that Petitioner's "'signature brand' of sexual assault . .

. involved the unusual aspect of sucking the toes of the victims." The record further reveals that the

trial court conducted a hearing prior to the admission of the Rule 404(b) evidence. (Document No.

41-13, pp. 4 - 44.) The trial court determined that  identity was clearly an issue in the case. (Id.)

Petitioner alleged an alibi defense and disputed that he was at the victim's residence at the time of

alleged sexual assault. (Id.) The victim, however, alleged that Petitioner sucked her toes during the

sexual assault. (Id.) The Rule 404(b) evidence revealed that Petitioner had two prior sexual assault

offenses wherein he sucked the toes of the victims. (Id.) Prior to testimony, the trial court gave the

following limiting jury instruction:

> All right. Ladies and gentlemen of the jury, you're about to hear some
> evidence regarding conduct or acts that are alleged against this defendant. These acts
> occurred approximately 10 years ago and involve this witness.
> You're instructed that the evidence that you are about to hear is not admitted
> as proof of the defendant's guilt in this case on these charges. This evidence is
> admitted for a limited purpose and may be considered by you only for a limited
> purpose, and that is to decide whether a specific element of this crime, that is charged
> in this indictment, has been proven.
> In this instance, the evidence may not be considered by you as proof of the
> charges in this case but only for the purpose of determining whether or not the State
> has proven a specific element of those crimes.
> The defendant is not now being tried for any specific acts that relate to the
> evidence that this witness is about to give, and you should bear this definitely in
> mind. The evidence that you're about to hear is being admitted and may be
> considered by you only so far as, in your opinion, it may go to show the identity and
> the plan or preparation of the defendant in this case.

(Document No. 41-13, pp. 136-37, 152-53.) During the final jury instructions, the trial court again

gave the jury the limiting instruction regarding the Rule 404(b) evidence, which the jury is presumed

to have followed. (Document No. 41-17, pp. 19 - 20.) Thus, the undersigned finds that Petitioner

was not unduly prejudiced by the admission of Rule 404(b) evidence so as to render Petitioner's trial fundamentally unfair. Even disregarding the Rule 404(b) testimony, there was adequate evidence to support the jury verdict. Accordingly, the undersigned concludes that Petitioner has failed to establish a denial of a federal right as to the above claim and therefore, the claim should be dismissed.

## 2.    Constitutionality of the Child Welfare Act:

In his Petition, Petitioner argues that "West Virginia Code § 49-7-3, 49-7-1, and 49-5-17(d) are unconstitutional and denied Petitioner the equal protection of the law in violation of the United States Constitution, 14th Amendment." (Document No. 2, p. 9 and Document No. 3, pp. 13 - 16.) Petitioner acknowledges that he "has argued this very point before in legal proceeding and has lost" in Hester v. State of West Virginia, 2008 WL 4298471 (S.D.W.Va.)(J. Johnston). (Id., p. 14.) Petitioner, however, contends that "the ruling of Judge Johnston is not conclusive to this Court nor is it res judicata due to the fact that 'it is not the province of the federal courts to address claims that are based strictly on claims of state law.'" (Id.) Petitioner argues that "[b]efore [his] arrest and during his criminal trial, he was a registered voter and resident in the County of Raleigh, West Virginia, along with being a tax paying citizen in the State of West Virginia." (Id., p. 15.) Petitioner, therefore, argues that his juvenile record should have been protected by W. Va. Code §§ 49-7-3 and 49-5-17(d), which "prohibited a West Virginia citizen's civil juvenile record from being used as the State's case-in-chief evidence." (Id.) Petitioner contends that W. Va. Code §§ 49-7-3 and 49-5-17(d) are unconstitutional because the statutes violate his right to equal protection under the Fourteenth Amendment. (Id.) Petitioner explains that the foregoing statutes violate his right to equal protection because the statutes "did not protect Petitioner's civil juvenile record from being used as the State's

case-in-chief evidence in an adult criminal trial while he is within the State of West Virginia." (Id.) Petitioner complains that "[i]f there is no West Virginia law that prohibits Petitioner's juvenile record from being used as the State's chief evidence in a West Virginia courtroom, while W. Va. Code §§ 49-7-3 and 49-5-17(d) protects other citizen's juvenile record from being used as the State's chief evidence while in a West Virginia courtroom, then Petition is not equally protected under the West Virginia law and West Virginia Code §§ 49-7-3 and 49-5-17(d) are unconstitutional." (Id.) Petitioner contends that the equal protection clause of the United States Constitution and West Virginia Constitution requires that Petitioner receive the protections set forth in West Virginia Code §§ 49-7-3 and 49-5-17(d), which would have prohibited his "juvenile record from being used in trial as the State of West Virginia's case-in-chief evidence." (Id., p. 16.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's claim should be dismissed because "West Virginia Code §§ 49-7-3, 49-7-1, and 49-5-17 are not violative of the Equal Protection Clause." (Document Nos. 36 and 37.) First, Respondent argues that "Petitioner was not denied equal protection of the laws, as the Circuit Court, correctly applying Rule 404(b) of the West Virginia Rules of Evidence and providing proper notice and hearing, did nothing to frustrate the purpose of the Equal Protection Clause of the Fourteenth Amendment." (Document No. 37, p. 20.) Next, Respondent notes that "Petitioner has previously challenged W. Va. Code § 49-5-1 et seq. in the United States District Court for the Southern District of West Virginia, in Hester v. West Virginia, 2008 WL 4298471 (2008), a decision relied upon by the Circuit Court in denying Petitioner habeas relief." (Id., p. 19.) Finally, Respondent notes that "Petitioner has tried to invoke constitutional protections to hide away his juvenile record, previously using the Full Faith and Credit Clause." (Id.) Respondent states that this Court has previously rejected Petitioner's argument finding

that "West Virginia has a strong interest in prosecuting sexual assault crimes occurring wholly within its jurisdiction, and the application of West Virginia's juvenile record confidentiality laws in such prosecutions is 'neither arbitrary nor fundamentally unfair." (Id., pp. 19 - 20.)

In Response, Petitioner continues to argue that "West Virginia Code § 49-7-3 is in violation of the United States Constitution's 14th Amendment (Due Process and Equal Protection) and Petitioner's rights thereof because it does not equally protect Petitioner's juvenile record from being used as the State's case-in-chief evidence in a criminal trial within West Virginia." (Document No. 46, pp. 10 - 14.) Petitioner explains that he "has always argued, throughout his State habeas petition, that W. Va. Code §§ 49-7-3 and 49-5-17(d), NOT (a), should have protected his juvenile record from being the State's chief evidence." (Id., p. 11.) Next, Petitioner disputes that Hester v. West Virginia, 2008 WL 4298471 (2008) is dispositive of the issue. (Id., p. 12.) Petitioner explains the "said court denied Petitioner relief on that argument because the Full Faith and Credit of the law does not apply to statute laws, but does absolutely apply to case laws." (Id.) Third, Petitioner argues that State *habeas* Court incorrectly construed the language of W. Va. Code § 49-7-3. (Id.) Petitioner states that "West Virginia legislature has taken that decision away from judges and made that decision for judges – that juvenile records can NOT be used as the State's case-in-chief evidence." (Id.) Petitioner contends that the West Virginia legislature intended for W. Va. Code § 49-7-3 to apply to "every West Virginia citizen's juvenile record while they are within the State." (Id.) Citing Workman v. Cardwell, 338 F.Supp. 893 (N.D.Oh. 1972),[5] Petitioner argues that this case "proves that the Constitution's Equal Protection of law mandates that W. Va. Code § 49-7-3 should have protected this Petitioner's said juvenile records while he is within the State of West Virginia." (Id.,

---

[5] The undersigned notes that a decision from the Northern District of Ohio is non-binding upon this Court.

23

p. 14.) Petitioner, therefore, argues that "W. Va. Code § 49-7-3 must be ruled unconstitutional, an equal protection violation, or "W. Va. Code § 49-7-3 . . . must be ruled to protect Petitioner's juvenile record." (Id.)

> Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:
>
> Petitioner relies upon West Virginia Code § 49-5-17(a), which states: "Records of juvenile proceedings conducted under this chapter are not public records and shall not be disclosed to anyone unless disclosure is otherwise authorized by this section." Petitioner attempts to apply this statute to this case by arguing that all juvenile records of West Virginia citizens, including those from other jurisdictions, shall remain confidential in all criminal proceedings within this state. Plaintiff has argued this very point before in legal proceedings and has lost. In Hester v. State of West Virginia, a memorandum opinion filed by the Honorable Thomas E. Johnston, District Judge, on September 18, 2008, 2008 WL 4298471 (S.D.W.Va.), the Court found that Mr. Hester misreads the statute in this regard. Judge Johnston succinctly dispatched the matter in the manner:
>
> > As Magistrate Judge Stanley noted, section 49-5-17(a) is applicable to "[r]ecords of juvenile proceedings conducted under this chapter." W. Va. Code § 49-5-17(a)(emphasis added). Neither of Plaintiff's juvenile proceedings, which took place in the District of Columbia and Ohio – were conducted under chapter 49 of the West Virginia Code. Therefore, the records of those proceedings are not made confidential by section 49-5-17(a). Plaintiff's first objection is **OVERRULED**.
>
> This court adopts the District Court's cogent analysis of the matter here, finding that juvenile proceedings in other jurisdictions are not afforded confidentiality protection under West Virginia Code § 49-5-17(a).
> There is another justifiable reason for not treating the petitioner's juvenile convictions as confidential. Had the petitioner been convicted of the sexually violent crimes as a fifteen-year-old in the State of West Virginia, the cases would very likely have been transferred to the criminal court, pursuant to West Virginia Code § 49-5-10. Therefore, any aspect of confidentiality would have vanished, as Mr. Hester would have been tried as an adult criminal defendant.

(Document No. 3-3, 14 - 15.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to the assignment of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 3-1.)

Petitioner appears to argue that the State *habeas* court incorrectly determined that his above claim was addressed in Hester v. State of West Virginia. Petitioner argues that his claim concerning the application of W. Va. Code § 49-5-17 was not properly addressed in Hester v. State of West Virginia because the Court only considered the application of W. Va. Code § 49-5-17(a), not the application of W. Va. Code § 49-5-17(d). The record, however, reveals that United States Magistrate Judge Mary E. Stanley found as follows:

> First, to the extent that Plaintiff has repeatedly alleged that the defendants have violated West Virginia's laws concerning the use and disclosure of juvenile records, found in Title 49 of the West Virginia Code, that claim lacks merit because those statutes are only applicable to records of juvenile proceedings that took place in West Virginia courts. See W. Va. Code § 49-5-17(a)("Records of a juvenile proceeding conducted under this chapter are not public records and shall not be disclosed to anyone unless disclosure is otherwise authorized by this section.") Thus, access to or disclosure of juvenile records from other states is not governed by the West Virginia statutes, but by the statutes of those states.

Hester v. State of West Virginia, Civil Action 5:07-00401, Document No. 53, pp. 10 - 11. Thus, Judge Stanley clearly determined that Title 49, which includes Section 49-5-17(d), of the West Virginia Code was not applicable to Petitioner's juvenile records. The undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct.

Next, Petitioner alleges that Title 49 of the West Virginia Code violates the Equal Protection Clause because it fails to protect the juvenile records of individuals, who have out-of-state juvenile records. (Document No. 1, pp. 12 - 14.) Petitioner, therefore, contends that individuals with out-of-state juvenile records are treated differently than those individuals with West Virginia juvenile records. The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the law." The Clause requires that similarly-situated individuals

25

be treated alike. <u>Giarratano v. Johnson</u>, 521 F.3d 298, 302 (4th Cir. 2008)(citations omitted). "Under an Equal Protection analysis, courts generally hold that 'legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." <u>Id.</u> at 302-03. In the instant case, Petitioner fails to provide any evidence that he is being treated differently than a similarly situated individual. Petitioner acknowledges that his juvenile proceedings occurred in Ohio and the District of Columbia. As stated above, this Court has determined that Title 49 of the West Virginia Code only applies to records of juvenile proceedings that took place in West Virginia courts. Petitioner does not allege, or produce any evidence, establishing that the State has applied Title 49 of the West Virginia Code to an individual with an out-of-state juvenile record. Additionally, as District Judge Johnston has already determined, "West Virginia has a strong interest in prosecuting sexual assault crimes occurring wholly within its jurisdiction, and the application of West Virginia's juvenile record confidentiality laws in such prosecutions is 'neither arbitrary nor fundamentally unfair.'" <u>Hester</u>, Civil Action 5:07-00401, Document No. 56, p. 7. Based on the foregoing, the undersigned finds that Petitioner's equal protection claim is without merit and should be dismissed.

**3.  Exclusion of DNA Evidence:**

In his Petition, Petitioner argues that the trial court violated his constitutional rights by excluding exculpatory seminal DNA evidence. (Document No. 2, p. 11 and Document No. 3, pp. 16 - 20.) Petitioner argues that "[b]y denying Petitioner's jury from the highly relevant facts pertaining to the case evidence of forensic DNA seminal fluid found on the crime scene by the State's investigators prejudiced Petitioner and his jury verdict." (Document No. 3, p. 16.) Petitioner argues that the jury would have found him not guilty if the "DNA seminal fluid found on the eleven

(11) year old victim's bed, which is inconsistent with Petitioner's guilt, would have been known by Petitioner's jury." (Id.) Petitioner claims that if the "crimes did occur, he did not commit the crimes." (Id.) Petitioner asserts that "[t]here could be several reasons why [M.K] lied and reported that Petitioner was the offender." (Id.) Petitioner contends that he "has always argued that the seminal fluid was left at the crime scene by the person who actually sexually assaulted the victim and was found the morning of, or the morning after the night of the sexual assault, by the Beckley City Police Department." (Id., p. 19.) Petitioner argues that the trial court's exclusion of the DNA evidence denied him a "fair trial in accordance with traditional and fundamental standards of due process." (Id., p. 20.) Petitioner claims that the DNA evidence should have been admitted "even with his alibi defense" because it "provides a direct link to someone other than the defendant." (Id.)

In his Motion for Summary Judgment, Respondent argues that State *habeas* Court correctly determined that the trial court "properly excluded seminal DNA evidence under 'Rape Shield' protections afforded to the victim and her family through West Virginia law." (Document Nos. 36 and 37.) Respondent notes that the record reveals "reasons Petitioner was not permitted to introduce evidence of other seminal DNA evidence found within the home." (Document No. 37, p. 20.) First, Respondent explains that "the seminal evidence complained of was found on shared bedding, and was likely the result of sexual activity between the victim's mother and her boyfriend or the victim's aunt and her boyfriend, who often stayed in the victim's room." (Id., p. 21.) Second, Respondent notes that "Petitioner's defense was one of alibi rather than specifically indicating the guilty of another individual." (Id.) Finally, Respondent argues that the trial court's evidentiary ruling prohibiting Petitioner's introduction of the DNA evidence (1) "does not rise to the level necessary to create a federal question as required under Ault v. Waid, 654 F.Supp.2nd 465, 485 (4th Cir.

2009)," and (2) "was not a 'mechanistic exclusion of evidence' as prohibited under <u>Ault</u>." (<u>Id.</u>, pp. 21 - 22.)

In Response, Petitioner argues that "the Supreme Court of the United States affirms it is a Constitutional violation to prohibit a defendant from presenting a full defense by denying proof of exculpatory evidence to the jury (Due Process of Law), which proves Petitioner's constitutional rights were violated by the State court prohibiting Petitioner from doing so." (Document No. 46, p. 15.) Petitioner complains that the trial court relied on hearsay evidence that the seminal DNA evidence could be the result of the victim's aunt and the aunt's boyfriend, who often stayed in the victim's room. (<u>Id.</u>) Additionally, Petitioner complains that the argument that the DNA evidence could have been the result of the victim's mother and boyfriend is discreditable because (1) neither the mother or her boyfriend testified concerning the issue, (2) "why would they have sex on the little girl's bed when the mother has a bed of her own to have sex on," and (3) "why would two adults want to have sex on a little child's bed half the size of the mother's bed." (<u>Id.</u>, pp. 15 - 16.) Finally, Petitioner argues that an "alibi defense and a third party guilt of exculpatory evidence goes hand and hand." (<u>Id.</u>, p. 16.) Petitioner argues that the exculpatory evidence "affirms someone else was there and committed the crimes in question." (<u>Id.</u>)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

. . . The record shows that the trial court afforded petitioner repeated opportunities to demonstrate how the presence of such unexplained seminal fluid was material to the defense; however, defense counsel was unable to persuade the court as to its relevance

\* \* \*

Upon reflection, the trial court's analysis of the matter was correct. It must be kept in mind that the defense raised by the petitioner at trial was alibi. This, of course, does not preclude the defense from raising other aspects or issues of reasonable doubt, and the court did permit the defense to adduce testimony to substantiate the point that there was no DNA to match the defendant. But the trial court properly

excluded evidence of seminal fluid which would have no bearing upon the sexual assaults at issue in this trial. It is improper to consider in this regard the fact that in this case, the evidence was that the assailant (Hester) did not ejaculate during these sexual assaults. Therefore, to allow into the record DNA evidence of some other unknown man's seminal fluid being found on the victim's bedclothes or pillowcase would be to invite pure speculation into this case.

> In a criminal case, the admissibility of testimony implicating another party as having committed the crime hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative. Consequently, where the testimony is merely that another person had a motive or opportunity or prior record of criminal behavior, the inference is too slight to be probative, and the evidence is there inadmissible. Where, on the other hand, the testimony provides a direct link to someone other than the defendant, its exclusion constitutes reversible error. Syllabus Point 1, State v. Harman, 165 W.Va. 494, 270 S.E.2d 146 (1980); Syllabus Point 2, State v. Malick, 193 W.Va. 545, 457 S.E.2d 482 (1995).

Here the inference that the seminal fluid might be attributed to Derrick Mickles, or to someone else, is too slight to be probative. There is no direct link of such fluid to another person, and even if there were so, it would not be relevant. The testimony of the victim was clear, and directly implicated the Petitioner. There was no evidence presented that Mr. Mickles, or anyone other than Mr. Hester, was the perpetrator in this case. The fact that unknown sperm was found on bedclothes in the child's room is of no moment simply because of the fact that there were two adult females in the residence who actively engaged in sexual activities with other adult males. Thus, the trial court properly excluded the speculative testimony sought by defense counsel. This ground therefore offers no relief unto this Petitioner.

(Document No. 3-3, 17 - 21.) The West Virginia Supreme Court adopted and incorporated the "Circuit Court's well-reasoned findings and conclusions as to the assignment of error raised in this appeal" and affirmed the decision of the Circuit Court. (Document No. 3-1.)

Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. Barbe, 521 F.3d at 452. When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp, 414 U.S. at 147, 94 S.Ct.

at 400. The "right to due process guarantees the right to a fair opportunity to defend against the

State's accusations . . . ." United States v. Jinwright, 683 F.3d 471, 482-83 (4th Cir. 2012)(internal

quotations omitted). This right, however, is not unlimited. See United States v. Scheffer, 523 U.S.

303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)(recognizing defendant's right to present relevant

evidence is subject to reasonable restrictions). "A defendant's interest in presenting such evidence

may . . . bow to accommodate other legitimate interest in the criminal trial process." Id.(citations

omitted). The exclusion of evidence as a result of accommodating these other legitimate interest is

only unconstitutional where the exclusion "has infringed upon a weighty interest of the accused" or

"significantly undermined the fundamental elements of the defendant's defense." Id. at 308, 315.

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State

*habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The State

*habeas* court determined that the trial court properly determined the seminal fluid to be irrelevant

and inadmissible. The record reveals that the "semen stain" could not be tied to a specific individual

or a particular time frame. Although the "semen stain" was discovered on a pillow in the victim's

room, the record reveals that the pillow was often moved throughout the house including the

mother's bedroom. It was undisputed that the mother was in a relationship and sexually active.

Additionally, the victim's aunt and boyfriend often stayed in the victim's bedroom where they were

sexually active. The trial court determined that the admission of the "semen stain" would result in

improper speculation by the jury. (Document No. 3-8, pp. 12 - 13.) Specifically, the trial court stated

as follows:

THE COURT:     Well, if that's all that you've got, it ain't coming in, and
you're not going to talk about semen because your defense is
alibi, 'I wasn't there,' The fact that there exists a semen stain,
which very clearly can't be related to your client, is not

30

relevant.

The absence of any DNA evidence, despite what you characterize as being a very thorough examination, the absence of any DNA that places your client in that house is arguable, but the fact that there's this unknown semen stain is not arguable because it doesn't relate to what she has to prove; it doesn't relate.

She can't tie it to your client. She can't tie it to a time; neither can you. And we don't know - - what you're wanting to be - - to have done is have the jury speculate that, because there was a semen stain on a pillowcase that was found after the alleged crime in the little girl's room that that clearly sets out or points to the existence of another perpetrator. That is speculation.

\* \* \*

. . . .It is not relevant to any issue that - - or any element that the State has to prove. It would require, absent all this tie-in information - - and if you can come up with something, I'll hear you again; but, based on what I'm hearing now, that the fact that there's a semen stain in that house, it's not your client's, then we cannot and I will not allow the jury to make a speculation that, well, it was there, therefore, there was some sexual activity in that house. And it was in her room, therefore, it must have been with her. And it wasn't his, therefore, it must be somebody else.

That is - - that is six or seven steps of speculation before you get to that semen stain. You're not getting it in. Note your exception and objection unless there's something else, and I'll readdress it later on if you believe that you have something else that you can do with it.

(Id., p. 13.) The undersigned further finds that the "semen stain" was not fundamental to Petitioner's alibi defense. Although the trial court prohibited the admission of evidence concerning the unknown "semen stain," the trial court permitted Petitioner to present evidence that his DNA was not found at the crime scene. (Id., p. 12.) Additionally, no evidence was presented that the alleged attacker

ejaculated during the assault of the victim. The record reveals that the victim specifically identified Petitioner as her attacker and testified that he did not ejaculate during the sexual assault. (Document No. 41-14, pp. 99 - 112, 159.) Based on the foregoing, the undersigned finds no indication that the exclusion of the unknown "semen stain" "infringed upon a weighty interest" or "significantly undermined the fundamental elements" of Petitioner's defense resulting in a violation of due process. The undersigned, therefore, finds that Petitioner's above claim is without merit and should be dismissed.

**4.    <u>Ineffective Assistance of Counsel</u>:**

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. <u>Id.</u> Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. <u>Id.</u> at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. <u>Id.</u> at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. <u>Id.</u> The Court in <u>Strickland</u> cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. <u>Id.</u> The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. <u>Stamper v. Muncie</u>, 944 F.2d 170, 178 (4th Cir. 1991), <u>cert.</u>

denied, 506 U.S. 1087 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel as set forth above.

### A. *Alibi Defense.*

In his Petition, Petitioner argues that trial counsel was ineffective in "failing to conduct a proper and effective alibi defense." (Document No. 2, p. 12 and Document No. 3, pp. 21 - 24.) Petitioner alleges that he timely notified trial counsel that he was innocent and that he had an alibi. (Document No. 3, p. 21.) Petitioner explains that on the date of the alleged crime, "he spent the day and night between the Fellowship Home and Toolbox Clubhouse, which are across the street from one another, until 11:00 to 11:30 p.m. on January 20, 2005, and then he went home." (Id.) Petitioner states that the alleged crime occurred between 11:00 p.m. to 7:00 a.m., and the victim's mother testified that she saw Petitioner before she left for work around 10:00 p.m. (Id.) Petitioner argues that his "alibi witnesses would have proved, by the Petitioner leaving the Fellowship Home and Toolbox Clubhouse between 11:00 to 11:30 p.m. during the night in question, it was impossible for the alleged victim's mother to have seen Petitioner while leaving for work at 10:00 p.m. and Petitioner could not have made it to the alleged victim's residents at 11:00 p.m. to commit the crimes in question." (Id.) Petitioner first claims that trial counsel was ineffective by failing "to inform the court and State of Petitioner's alibi defense in the required amount of time under West Virginia Rules of Criminal Procedure, Rule 12." (Id., p. 22.) Petitioner contends that the foregoing resulted in the State limiting his "alibi defense to only two witnesses, himself and Mr. Argent." (Id.) Second, Petitioner complains that trial counsel failed "to investigate Petition's alibi locations in a proper amount of time." (Id.) Petitioner asserts that trial counsel waited approximately 11 months to

investigate his alibi defense and the alibi location (Toolbox Clubhouse) had shutdown, which "denied Petitioner vital alibi witnesses to testify on his behalf." (Id., p. 23.) Petitioner alleges that "the use of Petitioner's alibi witnesses would have influenced his jury to find him not guilty, because it would have refuted the State's time line and two of their felony convicted witnesses (Danny McVay and Lisa Hartman)." (Id.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's ineffective assistance of counsel claim based upon an alibi defense is without merit. (Document Nos. 36 and 37.) Respondent first notes that trial counsel did assert an alibi defense in the underlying criminal matter. (Document No. 37, p. 22.) Second, Respondent contends that throughout the criminal process, Petitioner was unable to provide the name of a single individual who could verify Petitioner's alibi. (Id.) Respondent further notes that "[d]uring Petitioner's omnibus evidentiary habeas hearing, he was again unable to provide a single name of an alibi witness." (Id.) Therefore, Respondent argues that the State *habeas* court properly determined that "trial counsel was unable to assert anything more than a skeleton alibi defense." (Id.) Respondent asserts that "Petitioner's trial counsel cannot be deemed by this Court to have acted deficiently, and Petitioner cannot show how he was realistically prejudiced by an alleged failure of trial counsel to present an alibi defense that he himself could not support by anything other than his own word." (Id., p. 23.)

In Response, Petitioner argues he did "provide his trial counsel Joseph A. Noggy with names and exact locations of people to talk with concerning his alibi." (Document No. 46, p. 19.) Petitioner contends that during the omnibus hearing, Mr. Noggy affirmed "that he spoke to Petitioner's alibi witness and they confirmed Petitioner's alibi." (Id., pp. 19 - 20.) Petitioner argues that it was "Mr. Noggy's job to inform the investigators, the Circuit Court, or the State of Petitioner's alibi names

and location, just as it was Mr. Noggy's job to inform the Circuit Court or the State that Petitioner is presenting an alibi defense." (Id., p. 20.) Petitioner continues to argue that he was prejudiced by trial counsel's alleged ineffectiveness. (Id., p. 20 - 21.)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

The trial record shows that an alibi defense was in fact asserted by the defendant at trial, in that the defendant testified that he left the Fellowship Home and Toolbox Clubhouse between 11:00 and 11:30 on the night in question, walked home thereafter, and never visited the Kirby residence that night.

A difficulty arises with the petitioner's proposed alibi defense in that the State's evidence as to when the perpetrator entered the Kirby home is not absolutely fixed as to time. Patricia Kirby's work shift was from 11:00 p.m. to 7:00 a.m. (Tr. Volume III, 1/6/06, p. 500.) [M.K.] testified that Warren Hester came to her house shortly after her mother left for work, but stayed on the front porch of the house. (Tr. Vol. III, 1/6/06, p. 507.) Then, Mr. Hester left, but came back "a few minutes later." (Tr. Vol. III, 1/6/06, p. 508.) So, it is the court's analysis that the perpetrator's ultimate arrival time at the victim's house could have been 11:00 p.m., 11:30 p.m., or even later. Whether or not other residents observed the petitioner's presence at the Fellowship Home or the Toolbox Clubhouse at 11:00 p.m., or even 11:30 p.m., when the petitioner allegedly left those premises is immaterial. Petitioner did not claim that any resident of the Fellowship Home or member of the Toolbox Clubhouse accompanied him home. The fact of the matter is that the Fellowship Home is situate at the corner of Earwood and Woodlawn Avenue, and the Toolbox Clubhouse is located across the street at the top of Woodlawn. (Tr. Vol. V, 1/10/06, pp. 958 - 959.) Petitioner could have easily walked to the Kirby home, also situated on Woodlawn Avenue, after he left the Fellowship Home and Toolbox Clubhouse at 11:00 or 11:30 p.m. Unless someone watched him closely that night when he left the aforesaid facilities, and tracked him all the way home, such anticipated testimony of a fellow resident would have a nugatory effect.

Furthermore, the petitioner cannot provide the identity of any resident of the Fellowship Home or any member of the Toolbox Clubhouse that could purportedly serve as an alibi witness. At the initial habeas corpus hearing of June 30, 2010, this court inquired directly of the petitioner about the identity of witnesses who would know what time he left the Fellowship Home, as follows:

| | |
|---|---|
| THE COURT: | Do you know who we're talking about? |
| MR. HESTER: | Yes. The residents at the Fellowship Home. |
| THE COURT: | Do you have any names? |
| MR. HESTER: | Your Honor, it's been several years. I don't have any names. But like I said, the residents home is a residence. So it is not like - - it's not |

a hotel room. So each night it's going to be a
different person staying there.

(Tr., Omnibus Habeas Corpus Hearing, 6/30/10, pp. 64 - 65.)

It is clear then that it would be sheer speculation as to whether or not any
resident at the Fellowship Home may have noticed when the petitioner left the
facility that night. Because the residential make-up of the Fellowship Home is
constantly changing each night, the population would be in flux, with residents
coming and going. Without a name, or even a clue to the possible identity of
someone that had pertinent information, no defense attorney or investigator could
have possibly uncovered a prospective defense witness under such circumstances.
Lastly, this court notes that when Detective Shumate interviewed the petitioner
immediately after the incident in question, Mr. Hester was unable to provide to the
police that name of potential alibi witnesses. . . . The court concludes then that this
is a dead end. Furthermore, the undersigned observes that the defendant himself gave
to the police an alibi when he spoke to them at the time of his arrest. Also, it is clear
from the record that Mr. Noggy raised an alibi defense in discussions with the trial
court at the motions hearing of December 21, 2005. (Tr., 1/2/05, pp. 6 - 8.) The court
additionally notes that strategically, it may be unwise for a defendant to assert an
alibi defense early on in a criminal case because the State has more time to focus
upon such defense and it deprives the defense of flexibility to address the matter that
may arise in discovery. In any event, it is clear from the record that the defense
asserted in this case was alibi. In this opening statement, Mr. Noggy said as follows:

Now, all those versions were given by [M.K.] to different people.
You're going to see that there was one person – the other person that
would know what happened there or at least knew what he was
doing that night – which is Warren Hester, and he was picked upon
by the police, and he said, "I wasn't in the house. I didn't do this."

Therefore, the court perceives no prejudice to the defendant (petitioner) here based
upon the alleged 'lateness' in asserting a notice of alibi defense.

(Document No. 3-2, pp. 33 - 37.) The West Virginia Supreme Court adopted and incorporated the

"Circuit Court's well-reasoned findings and conclusions as to the assignment of error raised in this

appeal" and affirmed the decision of the Circuit Court. (Document No. 3-1.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State

*habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The State

*habeas* Court properly applied the standards set forth in <u>Strickland</u> in its determination that counsel

was not ineffective. Decisions concerning what defenses and evidence to present are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under <u>Strickland</u>. Trial counsel, however, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Id.</u> In determining the reasonableness of counsel's actions, consideration may be given to "the defendant's own statements or actions." <u>Id.</u>

First, Petitioner argues that his "alibi witnesses would have proved, by the Petitioner leaving the Fellowship Home and Toolbox Clubhouse between 11:00 to 11:30 p.m. during the night in question, it was impossible for the alleged victim's mother to have seen Petitioner while leaving for work at 10:00 p.m. and Petitioner could not have made it to the alleged victim's residents at 11:00 p.m. to commit the crimes in question." (<u>Id.</u>) The State *habeas* Court, however, thoroughly considered the above argument and found it to be without merit. Specifically, the State *habeas* Court determined that it was immaterial as to whether or not alibi witnesses observed Petitioner leaving the Fellowship Home or the Toolbox Clubhouse at 11:00 p.m., or 11:30 p.m. The State *habeas* Court noted that there was no witness to verify that Petitioner returned to his home after leaving the Fellowship Home and Toolbox Club.[6] Additionally, the record reveals that the location of the crime scene (the victim's home) was in close proximity to the Fellowship Home and Toolbox Clubhouse. Thus, Petitioner's conclusory claim that jury would not have convicted him if trial counsel would

---

[6] The trial testimony indicated that the assault occurred at approximately 11:00 p.m. to 11:30 p.m. and that Petitioner remained at the victim's residence until nearly 6:00 a.m. the following morning.

have presented testimony from alibi witnesses concerning Petitioner's alleged presence at the Fellowship Home or Toolbox Clubhouse between 11:00 p.m. and 11:30 p.m., is without merit. The undersigned finds that such testimony by alibi witnesses does not establish that Petitioner could not have committed the underlying offense. To the extent Petitioner argues that trial counsel testified during the omnibus hearing that counsel had witnesses who could affirm Petitioner's complete alibi, the record does not support his claim. The record reveals that trial counsel testified that "[w]e had people that would confirm that he was at the Fellowship Home, [b]ut the events that occurred later on were later than those witnesses that indicated - - I think they were consistent with Mr. Hester saying he was at the Fellowship Home earlier that day." (Document No. 41-19, p. 189.)

Next, Petitioner argues that he was prejudiced by trial counsel's delay in investigating his alibi witnesses. The State *habeas* Court determined that Petitioner's claim concerning the existence of alibi witnesses was speculative. The State *habeas* Court noted that Petitioner was unable to provide the names of any potential alibi witnesses. Detective Shumate testified at trial that even though Petitioner asserted an alibi defense at the time of the arrest, Petitioner was unable to provide the names of any potential alibi witnesses. The record further reveals that Petitioner remained unable to identify any potential alibi witnesses during his omnibus hearing. Although Petitioner argues that he has forgotten the names of witnesses due to the passage of time, the undersigned finds it unlikely that someone would forget the names of witnesses who allegedly could establish his innocence. Finally, Petitioner argues that trial counsel was ineffective in untimely asserting his alibi defense. The State *habeas* Court determined that any delay was due to trial strategy, the alibi defense was properly presented by trial counsel, and Petitioner was not prejudiced by the delay. Petitioner has failed to present any evidence establishing that trial counsel did not timely present his alibi defense

38

or that he was prejudiced by the delay. Based on the foregoing, the undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct. Therefore, Respondent is entitled to summary judgment regarding the above claim of ineffective assistance of counsel.

> **B. *Conflict of Interest.***

In his Petition, Petitioner argues that trial counsel was ineffective due to a conflict between trial counsel and witnesses Derrick Mickles and Lisa Hartman. (Document No. 2, p. 13 and Document No. 3, pp. 24 - 28.) Petitioner alleges that he was prejudiced by trial counsel's, or his law office's, representation of Mr. Mickles and Ms. Hartman in criminal proceedings. (Id.) First, Petitioner argues that trial counsel "could not investigate Mr. Mickles as being the actual person who left the forensic DNA seminal fluid found at the crime scene, . . . thereby, could not prove Mr. Mickles was the person who sexually assaulted the victim." (Id.) Next, Petitioner contends that trial counsel could not properly cross examine Ms. Hartman, a witness for the State, because he was "currently representing her in other criminal matters." (Id.) Petitioner claims that Ms. Hartman's testimony was critical to the State's case and it was imperative that trial counsel thoroughly cross-examine Ms. Hartman. (Id.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's ineffective assistance of counsel claim regarding a conflict of interest is without merit. (Document Nos. 36 and 37.) Respondent argues that the State *habeas* Court appropriately considered and denied Petitioner's above claim. (Document No. 37, p. 23.) First, Respondent argues that trial counsel raised the conflict of interest issue prior to trial, but the trial court rejected his argument concerning Mr. Mickles because Mr. Mickles was a not a person of interest as the victim immediately identified Petitioner

as her attacker. (Id.) Second, Respondent contends that the trial court appointed independent counsel for Ms. Hartman and Ms. Hartman waived the attorney-client privilege prior to testifying. (Id., p. 24.) Therefore, the Respondent notes that trial counsel was allowed to thoroughly and zealously cross-examine Ms. Hartman. (Id.) Respondent asserts that Petitioner benefitted from Mr. Hartman's waiver of attorney-client privilege because evidence concerning her excessive alcohol use would have been unknown to other counsel. (Id., p. 25.)

In Response, Petitioner argues first argues that it is immaterial that Mr. Mickles did not testify as a witness for the State. (Document No. 46, p. 22.) Petitioner complains that trial counsel "could not investigate Mr. Mickles as the person who left the seminal fluid on the little girl's child sized bed." (Id.) Petitioner argues that he "should have had an attorney that could have investigated Mr. Mickles of third party guilt." (Id., p. 23.) Next, Petitioner argues that "[a]lthough Ms. Hartman knowingly and intelligently waived her right to claim an attorney-client privilege with regard to any case that Mr. Noggy may have represented her on, that only eliminates the conflict of interest with Mr. Noggy and Ms. Hartman, it does NOT eliminate the conflict of interest of Mr. Noggy and Petitioner." (Id., pp. 23 - 24.)

The undersigned has thoroughly reviewed the record and cannot find that the State *habeas* court's determination that trial counsel was not ineffective based upon counsel's alleged conflict of interest was contrary to a reasonable application of federal law, or based on an unreasonable determination of facts. The undersigned first notes that the record clearly reveals that trial counsel filed a Motion to Withdraw as Counsel based upon the potential conflicts of interest involving Mr. Mickles and Ms. Hartman, but the trial court denied counsel's Motion. Concerning Mr. Mickles, the State *habeas* Court determined that trial counsel was not ineffective in failing to implicate Mr.

Mickles in the sexual assault. (Document No. 3-2, pp. 37 -39.) The record reveals that prior to trial,

trial counsel argued that he should be allowed to withdraw as counsel because Mr. Mickles (the

boyfriend of the victim's mother) could be the owner of the residue of seminal fluid that was found

the victim's pillowcase. (Document No. 35-11, pp. 4, 33 -34.) Trial counsel argued that it would be

inappropriate for him to investigate a prior client for possibly committing a crime. (Id.) After

thoroughly considering the argument, the trial court found as follows:

> As to Mr. Mickles, if all you've got is an unexplained errant semen stain, and
> you've got nothing else on Derrick Mickles, other than the fact that he was a regular
> visitor there, Derrick Mickles is - - I'm not - - that's not a conflict because, unless
> you have something you can tell that specifically relates to his guilt, you're not going
> to put on evidence that he is a reasonable alternative  - - someone else, yes, because
> you don't even have - - there is no evidence anywhere in this case to indicate to
> whom that stain belongs.
> An the fact that he was in that house would - - it would be somewhat akin to
> saying that the - - that a witness who saw someone leave a house and was there to
> deliver groceries or a new TV set, or had in the past week delivered a new TV set,
> would be a reasonable alternative defendant with nothing else. That's not proper;
> that's pure speculation, and that's not coming in unless you've got anything else. So
> Mickles is out.

(Id., pp. 42 - 43.) The record further reveals that Mr. Mickles did not testify as a witness for the

State. Additionally, there is no indication that Mr. Mickles was, or should have been, a person of

interest in the underlying crime. The victim immediately identified Petitioner as her assailant.

Petitioner fails to produce any evidence rebutting the State *habeas* Court's findings that trial counsel

did not act ineffectively in failing to investigate Mr. Mickles as the victim's assailant. Based on the

foregoing, the undersigned respectfully recommends that Petitioner's above claim of ineffective

assistance of counsel be dismissed.

Concerning Ms. Hartman, the State *habeas* Court determined that trial counsel was not

ineffective in failing to zealously cross-examine her. (Document No. 3-2, pp. 39 - 42.) The record

reveals that prior to trial, trial counsel argued that he should be allowed to withdraw as counsel because he could not properly cross-examine Ms. Hartman due the attorney-client privilege. (Document No. 35-11, p. 11.) Trial counsel, however, acknowledged that "I think we could actually - - if she was called and if we didn't have this attorney-client relationship, I think we could probably very effectively discredit much of what she has to say." (Id., p. 11.) Upon hearing trial counsel's concerns, the trial court appointed independent counsel to represent Ms. Hartman and scheduled a hearing to fully discuss the aspects of the attorney-client privilege. (Id., pp. 46 - 47.) The trial court then conducted an *in camera* hearing with Ms. Hartman and newly-appointed counsel, Amy Vickers Fritz. (Document No. 35-12, pp. 3 - 4.) Ms. Hartman acknowledged that Mr. Noggy had represented her in the past and that the State had presently subpoenaed her as a witness to testify against Petitioner. (Id., pp. 5  - 7.) The trial court thoroughly explained the attorney-client privilege, the potential conflict of interest, and the waiver of the attorney-client privilege. (Id., pp. 4 - 9.) Following the foregoing, Ms. Hartman waived the attorney-client privilege. (Id.)The trial court specifically determined that Ms. Hartman "knowingly and intelligently has waived her right to claim an attorney-client privilege with regard to any case that Mr. Noggy or the Public Defender's Office may have represented her on and that any information that they have received from her in that representation may be used by Mr. Noggy and/or Mr. Rasheed in representing Mr. Hester and to the negative of Ms. Hartman." (Id., pp. 27 - 28.) During trial, Ms. Hartman testified that on the evening of January 20, 2005, Petitioner came to her house and in exchange for some beer, she permitted Petitioner to suck her toes while he masturbated. (Document No. 35-14, pp. 239- 41.) Ms. Hartman further explained that her house was across the street from the victim's home. (Id., p. 236.) A review of the trial transcripts confirms the State *habeas* Court's finding that trial counsel zealously cross-

42

examined Ms. Hartman. (Id., pp. 246-68.) Specifically, trial counsel elicited testimony that Ms. Hartman was a severe alcoholic or binge drinker, who would often get drunk to the point she could not recall what she had done. (Id., pp. 247, 254-55.) Trial counsel further elicited testimony from Ms. Hartman that she had been drinking prior to Petitioner's arrival at her house. (Id., pp. 256-57.) There is no indication that trial counsel failed to thoroughly and  properly cross-examine Ms. Hartman. Based on the foregoing, the undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct. Respondent, therefore, is entitled to summary judgment regarding the above claim of ineffective assistance of counsel.

### C.  Admission of Rule 404(b) Evidence:

In his Petition, Petitioner argues that trial counsel was ineffective due his failure to prevent the admission of Petitioner's prior juvenile record. (Document No. 2, p. 14 and Document No. 3, p. 29.) In his Motion for Summary Judgment, Respondent argues that Petitioner's ineffective assistance of counsel claim regarding the admission of his juvenile record is without merit. (Document Nos. 36 and 37.) Specifically, Respondent argues that based upon his "argument in Subsection A above, Petitioner's Ground One, as it relates to trial counsel's performance in defending against inclusion of Petitioner's prior bad acts, should be summary dismissed as a matter of law. (Document 37, p. 27.) Petitioner failed to address the above issue in his Response. (Document No. 46.)

The undersigned finds that Petitioner has failed to demonstrate a violation of the United States Constitution or rebut the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The petitioner must come forward with evidence that the claim has merit.

Nickerson v. Lee, 971 F.2d 1125 (4th Cir. 1992), cert. denied, 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993), *abrogation on other grounds recognized*, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999). Unsupported, conclusory allegations do not entitle a petitioner to relief. See Beasley v. Halland, 649 F.Supp. 561, 566 (S.D.W.Va. 1986)(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones v. Gomez, 66 F.3d 199, 204 - 05 (9th Cir. 1995)(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"). The undersigned finds that Petitioner's above complaint that trial counsel failed to present proper arguments for the exclusion of his juvenile record is insufficient. Petitioner merely concludes that trial counsel was ineffective. Petitioner fails to allege or produce any evidence disputing the findings of the State *habeas* Court. (Document No. 3-2, pp. 42 - 43, 47 - 50.) Additionally, there is no indication that Petitioner would not have been convicted but for counsel's alleged failure to present stronger arguments for the exclusion of his juvenile record. Petitioner's prior juvenile record was admitted as Rule 404(b) evidence to establish identity based upon Petitioner's unusual fetish of "toe sucking." The record, however, reveals that the victim presented strong and convincing testimony that Petitioner was her assailant and that he engaged in "toe sucking" during the sexual assault. Additionally, Ms. Hartman testified that she had allowed Petitioner to suck her toes while he masturbated in exchange for beer. Respondent, therefore, is entitled to summary judgment upon the foregoing claim.

**D.  DNA Evidence:**

In his Petition, Petitioner argues that trial counsel was ineffective due his failure "to object to prosecutor's falsification of DNA case evidence." (Document No. 2, p. 14 and Document No. 3,

pp. 31 - 34.) Petitioner explains that trial counsel failed to "object to [the Prosecutor] lying to Petitioner's jury in the State's rebuttal portion of closing argument . . that there is no forensic evidence found in Petitioner's case." (Id.) Petitioner continues to argue that the seminal DNA evidence exculpated Petitioner. (Id.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's ineffective assistance of counsel claim regarding the DNA evidence is without merit. (Document Nos. 36 and 37.) Specifically, Respondent argues that based upon his "argument in Subsection C above, Petitioner's Ground Four, as it relates to the [trial court's] denial of admissibility of DNA evidence, should be summary dismissed as a matter of law." (Document 37, p. 27.) Petitioner failed to address the above issue in his Response. (Document No. 46.)

As explained above, the undersigned finds Petitioner's challenge to trial court's exclusion of the DNA evidence to be without merit. The record contains no evidence that the semen found on the pillowcase belonged to the assailant. The record establishes that the semen was the result of consensual sexual activity occurring between adults within the victim's household. Furthermore, the victim testified that her alleged assailant did not ejaculate during the sexual assault. The trial court, therefore, determined that the semen recovered in the investigation was irrelevant and inadmissible. Thus, trial counsel did not act ineffectively in failing to object to the prosecutor's statement that no DNA was recovered in this case. See United States v. Kilmer, 167 F.3d 889, 893 (5th Cir. 1999)(stating that "[a]n attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue"); Moore v. United States, 934 F.Supp. 724, 731 (E.D.Va. 1996)(holding that "there can be no claim of ineffective assistance where, as here,

counsel is alleged to have failed to raise a meritless argument"). Additionally, the record reveals that trial counsel presented evidence that Petitioner's DNA was not discovered at the crime scene. Therefore, Respondent is entitled to summary judgment regarding the above claim of ineffective assistance of counsel.

### D.  Religious Questioning:

In his Petition, Petitioner argues that trial counsel was ineffective due to his failure to object to prosecutor's religious questioning of the victim." (Document No. 2, p. 15 and Document No. 3, pp. 34 - 35.) Petitioner explains that he was "prejudiced by the State's case-in-chief testimonial evidence in front of the jury due to the State's opinionated religious questioning and the star witness' opinionated answers of the said questioning bolstered and enhanced the State's star witness' testimony." (Id.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's ineffective assistance of counsel claim regarding the religious questioning is without merit. (Document Nos. 36 and 37.) Specifically, Respondent argues that "[i]t has been longstanding practice in West Virginia for an attorney to establish a minor child's competency to serve as a witness and ability to understand the obligation of an oath when testifying at trial." (Document No. 37, p. 27.) Respondent contends that "Petitioner tries to skew the purpose of the State's questioning, asking that this Court view the State's commonplace strategy of establishing a minor child's ability to understand her oath to tell the truth as an attempt to interject some type of inadmissible religious testimony into Petitioner's trial." (Id., pp. 27 - 28.) Respondent argues that the "State was merely showing that M.K. had a moral obligation to tell the truth and understood the oath administered was more than just a procedural action." (Id., p. 28.) Finally, Respondent notes that trial counsel did object to the

46

question, but the trial court overruled the questioning because the State was establishing competency. (Id.) Petitioner failed to address the above issue in his Response. (Document No. 46.)

The undersigned finds that Petitioner's above claim of ineffective assistance of counsel is without merit. First, the Court finds that trial counsel did not act unreasonably. Despite Petitioner's claim to the contrary, the record reveals that trial counsel did object the State's religious questioning. (Document No. 35-14, p. 90.) Second, the Court finds that Petitioner cannot establish that he was prejudiced by any alleged failure on the part of trial counsel regarding his objection to the religious testimony. Therefore, Respondent is entitled to summary judgment on the above claim.

**E. Appellate Counsel:**

In his Petition, Petitioner argues that appellate counsel failed to effectively argue his claims before the West Virginia Supreme Court. (Document No. 2, p. 19 and Document No. 3, pp. 38 - 41.) Petitioner complains that appellate counsel was ineffective concerning his argument on the admission of Petitioner's juvenile record, DNA evidence, and religious questioning. (Document No. 3, pp. 38 - 40.) Specifically, Petitioner complains that appellate counsel "failed to back the assertions with facts from the record" and failed to adequately cite case law. (Id.)

In his Motion for Summary Judgment, Respondent argues that "the assignments of error alleged by Petitioner have since been covered in Petitioner's habeas proceedings, and have been found to be meritless in the [State habeas Court's] 99-page Order denying habeas relief." (Document No. 37, p. 30.) Respondent claims that "Petitioner has been unable to assert any legal basis and further, any evidence, that he has suffered unfair prejudice of a constitutional dimension." (Id.) Petitioner failed to address the above issue in his Response. (Id.)

Without determining whether appellate counsel's performance was deficient, the undersigned

finds that Petitioner has not demonstrated that he was prejudiced by appellate counsel's failure to file a more detailed brief. Petitioner merely concludes that his direct appeal would have been successful had appellate counsel prepared a more detailed brief. Petitioner, however, offers no evidence to support his conclusory claim. Furthermore, the undersigned has considered Petitioner's claims concerning his juvenile record, DNA evidence, and the religious questioning and has found the claims to be without merit. The undersigned, therefore, finds that Petitioner was not prejudiced by appellate counsels' failure to file a more detailed brief, and Respondent should be granted summary judgment.

**4.      Prosecutorial Misconduct:**

In his Petition, Petitioner contends that the prosecutor falsely stated during closing arguments that no DNA evidence was recovered, improperly asked the victim's religious questions, and improperly admitted Petitioner's juvenile records in its case in chief. (Document No. 2, pp. 15 - 18 and Document No. 3, pp. 31 - 38.)

In his Motion for Summary Judgment, Respondent argues that "Petitioner's underlying trial was not subject to prosecutorial misconduct." (Document Nos. 36 and 37.) Respondent notes that Petitioner's above claims of prosecutorial misconduct are "based entirely on the same contentions of error referenced above." (Document No. 37, p. 29.) Respondent contends that Petitioner's above claims of prosecutorial misconduct should be dismissed for the same reasons espoused in Subsection A, C, and D. (Id.)

In Response, Petitioner argues that "Respondent has failed in asserting any substantial argument and has failed to cite any Supreme Court of the United States Constitutional case law in alleging that it was not unconstitutional when (1) the State prosecutor lied in the State's closing

arguments about the exculpatory seminal case evidence, and (2) asking the State's star witness religious questions concerning the truthfulness of her testimony." (Document No. 46, p. 27.) Petitioner continues to argue that the prosecutor acted improperly by proffering his juvenile records. (Id., pp. 28 - 29.)

With respect to claims of prosecutorial misconduct, federal *habeas* review is available only upon a showing that the prosecutor's conduct was improper and that the conduct prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. United States v. Alerre, 430 F.3d 681, 689 (4th Cir. 2005); United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)(internal citations omitted). The test is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871-72, 40 L.Ed.2d 431 (1974).). The fact that the comments are "undesirable or even universally condemned" is insufficient to establish a due process violation. Id. In determining whether the prosecutor's comments denied the defendant of a fundamentally fair trial, the Court should consider the following factors: "(1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the errors were isolated or repeated." Arnold v. Evatt, 113 F.3d 1352, 1358 (4th Cir. 1997), cert. denied sub nom., Arnold v. Moore, 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); see also United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied sub nom.Wissler v. United States, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). The Court must not review the prosecutor's comments in isolation. Rather, the remarks must be reviewed in context of the entire proceedings to determine whether the comments violated

the defendant's right to a fundamentally fair trial. See Mitchell, 1 F.3d at 240; United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

For reasons stated above, the undersigned finds Petitioner's claim of prosecutorial misconduct based upon the prosecutor's reference to the lack of DNA evidence and Petitioner's juvenile record to be without merit. The undersigned has thoroughly addressed the issues above and finds it unnecessary to readdress the issues as there is no indication that the foregoing "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Concerning Petitioner's claim that the prosecutor acted improperly by asking religious questions to the victim, the undersigned finds his claim to be without merit. The record reveals that the prosecutor's religious questions were limited and were asked for the sole purpose of establishing the minor victim's competency to testify. Specifically, the victim was questioned as follows:

Q.      Did the lady in the courtroom here have you hold up your hand?

A.      Yes.

Q.      And what did she ask you to do, if you know?

A.      To tell the truth.

Q.      Do you know if a person came to court and then promised to tell the truth and then told a lie, do you know what would happen to them?

A.      They would go to jail.

Q.      Do you - - do you believe in God?

A.      Yes.

Q.      If a person came to Court and told a lie, would God care about that?

* * *

A.      Yes.

Q.      If that happened and God would know, what would  - - what would happen? What might God do?

A.      He would send you to hell.

(Document No. 35-14, pp. 89 - 90.) The record clearly reveals that the prosecutor's limited questions were for the sole purpose of verifying that the victim, who was a minor, understood her obligation to  testify truthfully. There is no indication that the prosecutor improperly injected the victim's religion or religious beliefs in the trial. Furthermore, there is no evidence that the limited questioning prejudicially affected Petitioner's substantial rights so as to deprive the Petitioner of a fair trial. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to above *habeas* ground.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment (Document No. 36.), **DISMISS** Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody (Document No. 2 and 3), and remove this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have seventeen days (fourteen days, filing of

51

objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to counsel of record.

Date: June 16, 2015.

R. Clarke VanDervort
United States Magistrate Judge